1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

LUIS ALONSO HIDALGO, III

Petitioner,

v.

TIM GARRETT,[1] *et al.*,

Respondents.

Case No. 3:16-cv-00618-MMD-CSD

ORDER

## I.    SUMMARY

Petitioner Luis Alonso Hidalgo III ("Petitioner Hidalgo"[2]) was sentenced in Nevada state court to, *inter alia*, two consecutive life sentences with parole eligibility after an aggregate of 20 years after being found guilty by a jury of conspiracy to commit battery with a deadly weapon, second-degree murder with the use of a deadly weapon, and two counts of solicitation to commit murder. (ECF No. 26-5.) This matter is before the Court for adjudication of the merits of the remaining grounds[3] in Petitioner Hidalgo's counseled third amended petition for writ of habeas corpus under 28 U.S.C. § 2254. (ECF No. 67

---

[1]The state corrections department's inmate locator page states that Petitioner Hidalgo is incarcerated at Lovelock Correctional Center. Tim Garrett is the current warden for that facility. At the end of this order, the Court directs the clerk to substitute Tim Garrett as a respondent for Respondent Robert LeGrand. *See* Fed. R. Civ. P. 25(d).

[2]As was noted in this Court's previous order granting the motion to dismiss in part, Luis Alonso Hidalgo III has the same name as his late father and co-defendant, Luis Alonso Hidalgo, Jr. At trial, and in some court-filed documents, their nicknames were used: Luis Alonso Hidalgo, Jr. was referred to as "Mr. H.," and Luis Alonso Hidalgo III was referred to as "Little Lou." Rather than using these nicknames, the Court will refer to Luis Alonso Hidalgo III as "Petitioner Hidalgo" and his father as "Hidalgo Sr."

[3]The Court previously dismissed grounds 9, 10, 11, 12, 13, 14, and 15. (ECF Nos. 83, 86.)

("Petition").) For the reasons discussed below, the Court denies the Petition and a Certificate of Appealability.

## II.    BACKGROUND[4]

On May 19, 2005, around 11:30 p.m., three friends were driving home from Lake Mead near Las Vegas, Nevada when they saw a dead body lying in the road. (ECF No. 23-2 at 26–27.) There were numerous advertisement cards for the Palomino Club, a strip club in North Las Vegas, found near the body. (ECF No. 23-3 at 21.) The victim, identified as Timothy Hadland, had been shot twice in the head. (ECF No. 23-4 at 70–71.)

Hadland's girlfriend, Paijik Karlson, testified that she and Hadland had gone camping at Lake Mead the evening of May 19, 2005, about two weeks after Hadland's job as a doorman at the Palomino Club ended. (ECF No. 23-2 at 48–49, 57–58.) Hadland received a phone call while they were camping, and after that call, Hadland told Karlson that he was going to meet "Angelo," who Karlson knew as Hadland's former coworker from the Palomino Club, to get some marijuana. (*Id.* at 63–64.) Hadland left to meet "Angelo" between 9:00 p.m. and 10:00 p.m. and never returned. (*Id.* at 65.)

Hidalgo Sr., Petitioner Hidalgo's father, owned the Palomino Club; Anabel Espindola, Hidalgo Sr.'s girlfriend, was the general manager of the Palomino Club; Petitioner Hidalgo was a manager at the Palomino Club; and Deangelo Carroll did promotions, helped DJ, and "helped on the floor" of the Palomino Club. (ECF No. 24-3 at 5, 9, 34–35.) There was testimony presented at the trial that, at one time or another, "all the adult clubs [in Las Vegas] pa[id] taxi drivers to bring them customers." (ECF No. 23-5 at 60–61.) Front doormen of the clubs would count the number of people a taxi driver brought to the adult club and give the taxi driver a slip, and the taxi driver would then use the slip to get paid. (*Id.* at 62.) Espindola testified that about a week before Hadland's

---

[4]The Court makes no credibility findings or other factual findings regarding the truth or falsity of this evidence from the state court. The Court's summary is merely a backdrop to its consideration of the issues presented in the Petition. Any absence of mention of a specific piece of evidence does not signify the Court overlooked it in considering Petitioner Hidalgo's claims.

murder, she heard a conversation between Hidalgo Sr. and Petitioner Hidalgo about how "[t]hey believed that Mr. Hadland was . . . falsifying tickets and getting a kickback." (ECF No. 24-3 at 37.) Hidalgo Sr. told Petitioner Hidalgo to watch Hadland, and a day or two later, Hidalgo Sr. indicated that Hadland needed to be fired. (*Id.* at 40, 42.)

Espindola, a prosecution witness, testified that on May 19, 2005, Carroll told her that Hadland "was going to another strip club and bad mouthing the . . . Palomino." (ECF No. 24-3 at 44–45.) Espindola told Hidalgo Sr. and Petitioner Hidalgo what Carroll had said, and although Hidalgo Sr. "didn't really react," Petitioner Hidalgo was angry. (*Id.* at 48.) Petitioner Hidalgo yelled to Hidalgo Sr., "[y]ou're not going to do anything? That's why nothing ever gets done. You'll never be like Gilardi and Rizzolo. They take care of business." (*Id.*) Petitioner Hidalgo then "mention[ed] that Rizzolo[, an owner of another adult club in Las Vegas,] had sent one of his employees to beat up a customer." (*Id.* at 50.) Hidalgo Sr. got angry and told Petitioner Hidalgo "to mind his own business." (*Id.*)

Later that evening, according to Espindola, Carroll came to visit Hidalgo Sr. (ECF No. 24-3 at 68.) After their conversation, Carroll and Hidalgo Sr. left the office. (*Id.* at 69.) Eventually, Hidalgo Sr. came back with another person, "PK," and told Espindola to "call [Carroll] and tell him to go to plan B." (*Id.* at 69–71.) Espindola called Carroll and told "him to go to plan B," but Carroll responded, "I'm already here." (*Id.* at 74.) Espindola again told Carroll to go to plan B, but the phone call was disconnected. (*Id.*) A little while later, Carroll returned to Hidalgo Sr.'s office and tells Hidalgo Sr. "[i]t's done." (*Id.* at 79.) Hidalgo Sr. ordered Espindola to get $5,000 from a safe, and Hidalgo Sr. gave the money to Carroll. (*Id.* at 80, 82.) The next morning, as Espindola and Hidalgo Sr. were watching the news, a story about "a death at Lake Mead" came on, and Hidalgo Sr. said, "he did it." (*Id.* at 87.) The following day, Petitioner Hidalgo came over and told Hidalgo Sr., "[d]on't worry, I already talked to [Carroll]. He said he's not going to say anything. He's dealt with the police before." (ECF No. 24-4 at 13.)

Rontae Zone, another prosecution witness, testified that Carroll got him a job handling out advertisement cards with Jayson Taoipu for the Palomino Club. (ECF No.

23-4 at 89–91.) On May 19, 2005, around noon, Zone was with Carroll and Taoipu, and Carroll "said that [Petitioner Hidalgo] . . . said that [Hidalgo Sr.] wanted someone" to be "dealt with," meaning killed. (ECF No. 23-5 at 4, 7.) Carroll asked Zone if he was "into doing it." (*Id.* At 4.) Zone said that he was not, but Taoipu said he was interested. (*Id.* at 4–5.) When asked if there was "any discussion as to how this would happen," Zone testified that "[t]here was discussion of baseball bats and there was a discussion of trash bags." (*Id.* at 5.) Zone testified that Carroll said that Petitioner Hidalgo "spoke of baseball bats and trash bags." (*Id.*) Carroll then pulled out "a .22 revolver with a green pearl handle," and Taoipu took it. (*Id.* At 7–8.) Carroll told Zone and Taoipu that Hidalgo Sr. "was going to pay $6,000 to the man who killed him." (*Id.* at 11.)

According to Zone, later that day, he, Carroll, and Taoipu picked up Kenneth Counts in a van and drove to Lake Mead. (ECF No. 23-5 at 14–16.) Carroll said that they were going to meet Hadland to kill him. (*Id.* at 18.) Carroll called Hadland while they were driving and told him that they were coming to smoke with him. (*Id.* at 19.) Hadland, who had driven from his campground to the location of the van, parked his car, walked up to the van, and started talking to Carroll, who was sitting in the driver's seat. (*Id.* at 25–26.) Meanwhile, Counts exited the van, shot Hadland in the head, and then shot Hadland in the head again "after he hit the ground." (*Id.* at 27.) Counts got back into the van, and they drove to the Palomino Club. (*Id.* at 28, 30.) The next day Carroll changed the van's tires and "cleaned up the interior and he had washed the van." (*Id.* at 33–34.)

Law enforcement located Hadland's cell phone in his car, and the last call Hadland received was from Carroll. (ECF No. 23-8 at 13.) Law enforcement contacted Carroll, and to determine who orchestrated the killing, law enforcement asked Carroll to wear a recording device. (*Id.* at 56.) Carroll agreed and recorded a conversation he had with Espindola and Petitioner Hidalgo. (ECF No. 26-18 at 10.) After Carroll mentioned the other two guys in the van, Zone and Taoipu, possibly snitching about the murder, Petitioner Hidalgo said, "[c]ould you have fucking [Counts] kill them too, we'll fucking put

something in their food so they die of rat poison or something." (*Id.*) After Carroll replied, "[w]e can do that too," Petitioner Hidalgo said, "[a]nd we get [Counts] last." (*Id.*)

Although Petitioner Hidalgo did not testify at the trial, Hidalgo Sr., who was tried with Petitioner Hidalgo, testified. (ECF No. 25-6 at 60.) Hidalgo Sr. denied hearing that Hadland was "badmouthing" the club from Espindola or Petitioner Hidalgo. (ECF No. 25-7 at 7.) Rather, Hidalgo Sr. testified that he had yelled at Carroll about something unrelated to Hadland, and then "maybe about 10" minutes later, Carroll came back to report about Hadland's "badmouthing." (*Id.* at 8.) Hidalgo Sr. "said so what, you know, what's the big deal, you know? And . . . [Carroll] mumbled, murmured to [Espindola] saying, well, job security." (*Id.* at 11.) Carroll then said, "well, maybe I . . . should go talk to him." (*Id.*) Espindola replied, "if you're going to go talk to him, you talk to him on your own. That's entirely up to you." (*Id.*) As Carroll was leaving, Hidalgo Sr. said, "if you want to talk to him, just tell him to stop it, you know what I mean." (*Id.* at 12.) Hidalgo Sr. testified that Petitioner Hidalgo was not in the room when this conversation occurred, and Hidalgo Sr. never asked or insinuated that someone should harm Hadland. (*Id.* at 12, 14.)

According to Hidalgo Sr., Carroll came back later that night and told Espindola, "I fucked up," explaining that "the dude got out of the car and put the bullet in the guy's head." (ECF No. 25-7 at 16.) Carroll said they were smoking dope on the way to Lake Mead and the man who kill Hadland now wanted $5,000. (*Id.*) Carroll said, "and by the way, he's a Crip, a gang member with the Crips, and you better not fuck with my boy." (*Id.* at 18.) Hidalgo Sr. paid the $5,000 out of fear. (*Id.* at 19.)

The jury found Petitioner Hidalgo guilty of conspiracy to commit a battery with a deadly weapon or battery resulting in substantial bodily harm, second-degree murder with the use of a deadly weapon, and two counts of solicitation to commit murder as to Taoipu and Zone. (ECF No. 25-13 at 4.) Petitioner Hidalgo appealed his judgment of conviction, and the Nevada Supreme Court affirmed. (ECF No. 26-8.) Petitioner Hidalgo sought post-conviction relief. (ECF No. 26-9.) The state district court denied relief, and the Nevada Supreme Court affirmed. (ECF Nos. 26-13, 26-16.)

### III.    GOVERNING STANDARD OF REVIEW

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could

6

1 disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562

2 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The

3 Supreme Court has stated "that even a strong case for relief does not mean the state

4 court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at

5 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as

6 a "difficult to meet" and "highly deferential standard for evaluating state-court rulings,

7 which demands that state-court decisions be given the benefit of the doubt" (internal

8 quotation marks and citations omitted)).

9    **IV.    DISCUSSION**

10    **A.    Ground 1—Jury Instruction No. 40**

11       In ground 1, Petitioner Hidalgo alleges that his Fifth, Sixth, and Fourteenth

12 Amendment rights to due process of law and to a fair trial were violated because Jury

13 Instruction No. 40 erroneously instructed that the existence of a conspiracy and his

14 membership in it could be established by "slight evidence." (ECF No. 67 at 81.)

15       Jury Instruction No. 40 provided as follows:

16          Whenever there is slight evidence that a conspiracy existed, and that
   the defendant was one of the members of the conspiracy, then the
17    statements and the acts by any person likewise a member may be
   considered by the jury as evidence in the case as to the defendant found to
18    have been a member, even though the statements and acts may have
   occurred in the absence and without the knowledge of the defendant,
19    provided such statements and acts were knowingly made and done during
   the continuance of such conspiracy, and in furtherance of some object or
20    purpose of the conspiracy.
          This holds true, even if the statement was made by the co-
21    conspirator prior to the time the defendant entered the conspiracy, so long
   as the co-conspirator was a member of the conspiracy at the time.
22          The statements of a co-conspirator after he has withdrawn from the
   conspiracy were not offered, and may not be considered by you, for the truth
23    of the matter asserted. They were only offered to give context to the
   statements made by the other individuals who are speaking, as or adoptive
24    admissions or other circumstantial evidence in the case.
          An adoptive admission is a statement of which a listener has
25    manifested his adoption or belief in its truth.

26 (ECF No. 26-17 at 44.)

27 ///

28 ///

7

### 1.    Standard for reviewing jury instructions

Issues relating to jury instructions are not cognizable in federal habeas corpus unless they violate due process. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *see also Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) ("[W]e have never said that the possibility of a jury misapplying state law gives rise to federal constitutional error."). The question is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,' . . . not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'" *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973)). And significantly, when reviewing a jury instruction, the Court considers that jury instruction "in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72.

### 2.    State court determination

In affirming Petitioner Hidalgo's judgment of conviction, the Nevada Supreme Court held:

> Hidalgo first argues that Jury Instruction No. 40's reference to "slight evidence" is a misstatement of the applicable law because it provided the incorrect burden of proof for establishing a conspiracy. We disagree.

> Whether a proffered jury instruction is an accurate statement of law is a legal question for de novo review. *Nay v. State*, 123 Nev. 326, 330, 167 P.3d 430, 433 (2007). NRS 51.035(3)(e) defines as nonhearsay the statements uttered by coconspirators of the defendant during the course and in furtherance of the conspiracy. Preliminary questions concerning the admissibility of evidence shall be determined by the judge. NRS 47.060. In determining the admissibility of coconspirator statements, the district court may determine the existence of a conspiracy by a "slight evidence" standard. *McDowell v. State*, 103 Nev. 527, 529, 746 P.2d 149, 150 (1987).

> Here, the instruction informed the jury on a permitted use of hearsay under NRS 51.035(3)(e). Thus, it did not misstate the law, as it provided the relevant admissibility standard for consideration of coconspirator statements under *McDowell*.

> [FN2] Because the jury instruction did not actually reduce the State's burden of proof, we reject Hidalgo's argument that it amounted to structural error. *Cage v. Louisiana*, 498 U.S. 39, 40 (1990) (finding structural error where a jury instruction reduced the State's burden by equating reasonable doubt with grave uncertainty).

> Nevertheless, Hidalgo next contends that the instruction's language created a risk that the jury would improperly confuse the standard for

8

1    admissibility of coconspirator statements with the standard of beyond a reasonable doubt for convicting him of conspiracy.

2    "This court evaluates appellate claims concerning jury instructions using a harmless error standard of review." *Barnier v. State*, 119 Nev. 129, 132, 67 P.3d 320, 322 (2003). An erroneous instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Estelle v. McGuire*, 502 U.S. 62, 72, (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). As such, Hidalgo must show a "reasonable likelihood" that the jury would have concluded that this jury instruction, when read in context with other instructions, authorized a conviction based on slight evidence. *See Boyde v. California*, 494 U.S. 370, 381 (1990).

8    Here, the jury was repeatedly instructed regarding the applicable burden of proof: guilt beyond a reasonable doubt. As the district court explained in denying Hidalgo's motion for new trial, "it seems inconceivable that the jury could have misunderstood those six (6) words in instruction 40 considering that the jury was instructed more than ten (10) times on the State's burden of proof."

11   Thus, we conclude that any error in the Jury instruction's reference to "slight evidence" was harmless.

13   (ECF No. 26-8 at 3–4.)

14   ### 3.    Analysis

15   The Nevada Supreme Court has held that "[t]he preliminary question of the

16   existence of a conspiracy for purposes of NRS 51.035(3)(e)[5] need only be

17   established . . . by 'slight evidence.'" *McDowell v. State*, 746 P.2d 149, 150 (Nev. 1987);

18   *see also Peterson v. Sheriff, Clark Cnty.*, 598 P.2d 623, 624 (Nev. 1979) ("[A]pplication

19   of the coconspirator exception is contingent upon a showing, by independent evidence,

20   that a conspiracy existed."). Although it does not appear that it was necessary to instruct

21   the jury regarding this evidentiary threshold to determine whether a co-conspirator's

22   statements should be admitted, the Nevada Supreme Court reasonably concluded that

23   Jury Instruction No. 40 did not misdescribe the prosecution's burden of proof or confuse

24   the jury as to the State's burden of proof. *See Sullivan v. Louisiana*, 508 U.S. 275, 281

25   (1993) (explaining that "the essential connection to a 'beyond a reasonable doubt'

27   [5]NRS § 51.035(3)(e) provides that a statement is hearsay unless "[t]he statement is offered against a party and is . . . [a] statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

factual finding cannot be made where the instructional error consists of a misdescription of the burden of proof, which vitiates *all* the jury's findings"). Indeed, rather than instructing that the existence of a conspiracy could be established by "slight evidence," as Petitioner Hidalgo contends, Jury Instruction No. 40 merely outlined the preconditions to the jury's consideration of a coconspirator's statements in furtherance of a conspiracy as evidence against another member of the conspiracy.[6]

Further, as the Nevada Supreme Court reasonably noted, the jury was also instructed in Jury Instruction No. 35 that Petitioner Hidalgo "is presumed innocent until the contrary is proved," and "[t]his presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged and that the Defendant is the person who committed the offense." (ECF No. 26-17 at 39.) And Jury Instruction No. 15 instructed that "[t]o be guilty of conspiracy, a defendant must intend to commit, or to aid in the commission of, the specific crime agreed to." (*Id.* at 19.)

Therefore, because Jury Instruction No. 40 did not violate due process, especially when considered in conjunction with Jury Instruction Nos. 15 and 35, *Estelle*, 502 U.S. at 72, the Nevada Supreme Court's determination constitutes an objectively reasonable application of clearly established federal law and was not based on an unreasonable application of the facts. Petitioner Hidalgo is not entitled to federal habeas relief for ground 1.

**B.    Ground 2—Carroll's Recorded Statement**

In ground 2, Petitioner Hidalgo alleges that the state district court erred and violated his Fifth, Sixth, and Fourteenth Amendment rights when it failed to admit Carroll's

---

[6]Petitioner Hidalgo also appears to assert that Jury Instruction No. 40 created an improper barrier to the consideration of evidence. (ECF No. 67 at 82.) However, the case Petitioner Hidalgo cites in support of this assertion, *Cool v. United States*, 409 U.S. 100, 104 (1972), discusses the creation of "an artificial barrier to the consideration of relevant defense testimony," which is inapplicable here.

recorded statement, which exculpated him, for the truth of the matter asserted and as substantive evidence of his innocence. (ECF No. 67 at 83.)

### 1. Background information

While wearing a recording device following the murder and speaking with Espindola and Petitioner Hidalgo, Carroll made the following comment, apparently towards Petitioner Hidalgo: "what the fuck are you talking about[,] don't worry about it . . . you didn't have nothing to do with it." (ECF No. 48-24 at 65.) Neither Petitioner Hidalgo nor Espindola commented on this statement. (*Id.*)

Petitioner Hidalgo's trial counsel mentioned this statement at the beginning of his opening statement, saying, "the man who was sent by the police to get incriminating evidence . . . stopped [Petitioner Hidalgo] . . . when he first made a comment and he said, [w]hat are you saying? You had nothing to do with this." (ECF No. 23-1 at 73.) A little later in opening arguments, counsel stated, "[o]ut of Deangelo Carroll's mouth is the best evidence in the case, [Petitioner Hidalgo], you had nothing to do with it." (ECF No. 23-2 at 3.)

During the trial, Petitioner Hidalgo's counsel argued that Carroll's statement was admissible "under the hearsay exceptions." (ECF No. 23-6 at 8.) Following the prosecutor's argument on the issue, the state district explained, "[t]hey're not saying that Deangelo Carroll's statement is truthful. They're saying . . . that the acquiescence in this statement was a statement by a coconspirator, that the fact that they didn't contradict it, that it was adopted by failure to contradict." (*Id.* at 10.) The state district court later ruled: "the statements of Deangelo Carroll after he has withdrawn from the conspiracy were not offered and may not be considered by you for the truth of a matter asserted." (ECF No. 25-9 at 76.) However, the state district court stated that "they may be considered to give context to the statements made by the other individuals who are speaking as adoptive admissions or as other circumstantial evidence." (*Id.* at 80.) The state district court's ruling was encompassed in Jury Instruction No. 40. (ECF No. 26-17 at 44.)

///

1

## 2. Standard of review regarding right to present a defense

2      "The right of an accused in a criminal trial to due process is, in essence, the right

3  to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*,

4  410 U.S. 284, 294 (1973); *see also Washington v. Texas*, 388 U.S. 14, 19 (1967)

5  (explaining that an accused "has the right to present his own witnesses to establish a

6  defense" and that "[t]his right is a fundamental element of due process of law"); *DePetris*

7  *v. Kuykendall*, 239 F.3d 1057, 1062 (9th Cir. 2001) ("The Supreme Court has made clear

8  that the erroneous exclusion of critical, corroborative defense evidence may violate both

9  the Fifth Amendment due process right to a fair trial and the Sixth Amendment right to

10  present a defense."). "[T]he Constitution [also] guarantees criminal defendants 'a

11  meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S.

12  683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). A

13  defendant's opportunity to be heard "would be an empty one if the State were permitted

14  to exclude competent, reliable evidence . . . when such evidence is central to the

15  defendant's claim of innocence." *Id.* This is because, "[i]n the absence of any valid state

16  justification, exclusion of . . . exculpatory evidence deprives a defendant of the basic

17  right to have the prosecutor's case encounter and 'survive the crucible of meaningful

18  adversarial testing.'" *Id.* at 690-91 (quoting *United States v. Cronic*, 466 U.S. 648, 656

19  (1984)). That said, the United States Supreme Court has "never questioned the power

20  of States to exclude evidence through the application of evidentiary rules that

21  themselves serve the interests of fairness and reliability—even if the defendant would

22  prefer to see that evidence admitted." *Id.* at 690.

23

## 3. State court determination

24      In affirming Petitioner Hidalgo's judgment of conviction, the Nevada Supreme

25  Court held:

26          In the days following Hadland's murder, Deangelo Carroll, who was
one of Hidalgo's coconspirators but who also acted as a police informant,
27  was recorded as saying to Hidalgo in Anabel Espindola's presence: "[D]on't
worry about it ... you didn't have nothing [sic] to do with it." At trial, Hidalgo
28  sought to introduce this potentially exculpatory statement for its substantive

truth. On hearsay grounds, the district court prohibited Hidalgo from introducing the statement for its truth, but instead permitted Hidalgo to read the statement into the record and argue that Espindola believed it to be true based on her silence.

On appeal, Hidalgo contends that he was improperly prohibited from introducing the statement as exculpatory evidence. This argument is two-prong, as Hidalgo argues that: (1) Carroll's statement should have been admitted for its truth as an admission of a party-opponent under NRS 51.035(3)(d); and (2) even if not, due process required it to be admitted regardless of its hearsay status.

<u>The statement was properly excluded as hearsay</u>

Hidalgo contends that because Carroll was operating as a State agent, his statement should have been admitted for its truth as an admission of a party-opponent. We disagree.

Under NRS 51.035(3), an admission by a party is not hearsay and is admissible for the truth of the matter asserted. This doctrine extends to statements made by the party's "agent or servant concerning a matter within the scope of the party's agency or employment." NRS 51.035(3)(d).

Nevada has never considered whether statements made by a police informant qualify under the agency exception to the hearsay rule. However, even among other jurisdictions to consider this issue, "it appears fairly well-settled that statements by government agents at the investigative level are not admissible" under the agency exception. *State v. Asbridge*, 555 N.W.2d 571, 576 (N.D. 1996) (emphasis added) (setting forth the majority view among federal courts).

[FN3] Hidalgo cites *U.S. v. Branham*, 97 F.3d 835, 851 (6th Cir. 1996), for the proposition that the statements of a paid informant are admissible against the government. We find this argument unpersuasive. The case at hand is markedly distinguishable from *Branham*, which has not been extended beyond the scenario of paid informants. Moreover, *Branham* stands in stark contrast to the majority of courts that have considered this narrow issue and concluded that the out-of-court statements of a government informant are not admissible in a criminal trial as an admission by the agent of a party-opponent. *See U.S. v. Yildiz*, 355 F.3d 80, 81-82 (2nd Cir. 2004); *Lippay v. Christos*, 996 F.2d 1490, 1499 (3rd Cir. 1993) (holding that statements by informers are generally not intended to fall under the agency exception given the tenuous relationship between informers and police officers).

Thus, because Carroll's statement occurred at the investigative level, the district court properly determined that it was only admissible for context and impeachment purposes, and not for its truth as substantive evidence of innocence.

[FN4] Hidalgo makes two alternative arguments that are unpersuasive. First, he argues that Carroll's statement should have been admitted under NRS 51.315. As discussed in more detail below, this argument fails due to the statement's

13

unreliable nature. *See* NRS  51.315(1)(a) (requiring that the "circumstances under which [the statement] was made offer strong assurances of accuracy").

Second, Hidalgo contends that the statement should have been admitted for its truth as an "adoptive admission" under NRS 51.035(3)(b) because Espindola's silence was an adoption of Carroll's proclamation. We disagree, as the statute only allows for statements made by a party opponent, and Espindola would not qualify as such. To the extent that Hidalgo also argues that a different portion of Jury Instruction No. 40 improperly allowed the jury to consider Carroll's tape-recorded statements as adoptive admissions but not for their truth, we conclude that any error was harmless. The record shows that Hidalgo was permitted to read the statement to the jury and argue that Espindola believed it to be true, implicitly arguing that he had nothing to do with the conspiracy.

Exclusion of the statement did not violate due process

Hidalgo argues that he was constitutionally entitled to have Carroll's statement admitted for its truth. *See Chia v. Cambra*, 360 F.3d 997, 1003 (9th Cir. 2004) ("[W]hen a hearsay statement bears persuasive assurances of trustworthiness and is critical to the defense, the exclusion of that statement may rise to the level of a due process violation.").

Here, we conclude that the district court did not commit a due process violation in excluding this evidence, as Carroll's tape-recorded statement does not bear the requisite assurances of trustworthiness. Although probative on the issue of whether Hidalgo was aware of the hit on Hadland prior to the killing, the circumstances surrounding Carroll's statement render the statement unreliable because he was acting as a police informant and had been prompted to make false statements to elicit incriminating responses. Also, Carroll's statement was not against his penal interest, as he had already provided a full confession and his apparent purpose for meeting with Hidalgo was to gain favor with law enforcement.

(ECF No. 26-8 at 4–7.)

**4.   Analysis**

"[W]hen a hearsay statement bears persuasive assurances of trustworthiness and is critical to the defense, the exclusion of that statement may rise to the level of a due process violation." *Chia v. Cambra*, 360 F.3d 997, 1003 (9th Cir. 2004). The Nevada Supreme Court reasonably determined that Carroll's statement did not bear these requisite assurances of trustworthiness. In fact, as the Nevada Supreme Court reasonably noted, at the time he made the statement that Petitioner Hidalgo "didn't have nothing to do with" the murder, Carroll was working as a police informant, wearing a wire

to obtain incriminating statements, and had been told to lie. Sergeant Michael McGrath testified that prior to having Carroll wear the recording device, he "told [Carroll] some prompts or things [he] wanted [Carroll] to say to gain information and reactions," including telling lies. (ECF Nos. 23-8 at 3, 24-2 at 18.) Further, as was also reasonably noted by the Nevada Supreme Court, Carroll's purpose in meeting with Petitioner Hidalgo and Espindola was to gain favor with law enforcement and attempt to place the blame on them. Thus, Carroll's statement, which the jury heard during the trial, had questionable reliability. Accordingly, the Nevada Supreme Court reasonably determined that the state district court's instruction that the jury could not consider the statement for the truth of the matter asserted did not violate Petitioner Hidalgo's right to due process. *See Chambers*, 410 U.S. at 294. As such, Petitioner Hidalgo fails to demonstrate that his right to a fair opportunity to defend against the State's accusations or right to present a complete defense were violated. *See Chambers*, 410 U.S. at 294; *Crane*, 476 U.S. at 690. Because the Nevada Supreme Court's determination constitutes an objectively reasonable application of clearly established federal law and was not based on an unreasonable application of the facts, Petitioner Hidalgo is not entitled to federal habeas relief for ground 2.

## C.     Ground 3—Admission of Former Testimony

In ground 3, Petitioner Hidalgo alleges that the state district court erred and violated his Fifth, Sixth, and Fourteenth Amendment rights in denying admission of Taoipu's former testimony. (ECF No. 67 at 85.)

### 1.     Background information

As a reminder, when asked if there was "any discussion as to how [the murder] would happen," Zone testified that "[t]here was discussion of baseball bats and there was a discussion of trash bags." (ECF No. 23-5 at 5.) When asked who spoke of these items, Zone testified that Carroll said that Petitioner Hidalgo "spoke of baseball bats and trash bags" in front of him and Taoipu. (*Id.*) Contrarily, during Counts's trial, which occurred prior to Petitioner Hidalgo's trial, Taoipu testified that "before [they] went to go

1  pick up [Counts]," Carroll "told [them] that he called [Espindola,] and [Espindola] was

2  talking about baseball bats and trash bags." (ECF No. 27-1 at 31, 67.)

3       Petitioner Hidalgo's trial counsel moved to admit Taoipu's statement from

4  Counts's trial, arguing that it was exculpatory evidence as to Petitioner Hidalgo. (ECF

5  No. 25-8 at 59.) Hidalgo Sr. objected on Confrontation Clause grounds. (*Id.* at 62.) The

6  state district court disallowed the statement to be introduced, explaining that "if you let

7  in the statement that's inconsistent with what Rontae Zone testified to, . . . that opens

8  the door to other statements that Jason Taoipu made . . . that indicate that [Petitioner

9  Hidalgo] was involved and gave the order." (*Id.* at 63.) The state district court further

10  explained: "you can't just take the one exculpatory statement without looking and at least

11  having part of the transcript in that pertains to [Petitioner Hidalgo]'s involvement." (*Id.*)

12       Later, Petitioner Hidalgo's counsel requested that Zone's "testimony related to

13  bats and bags be stricken from the record," since "we weren't allowed to put in the part

14  of [Taoipu's] transcript which speaks directly to that point." (ECF No. 25-10 at 19.) The

15  state district court disagreed, stating "they are allowed to comment on that." (*Id.* at 20.)

### 2.    State court determination

17       In affirming Petitioner Hidalgo's judgment of conviction, the Nevada Supreme

18  Court held:

19           Hidalgo argues that the district court abused its discretion in
20       excluding a portion of Jason Taoipu's former testimony from the Kenneth
         Counts murder trial, in which Taoipu stated that Espindola (instead of
21       Hidalgo) had instructed Carroll to bring baseball bats and trash bags to the
         Palomino on the night of Hadland's murder.

22           [FN5] Hidalgo also challenges the district court's
23       determination that a partial admission of Taoipu's former
         testimony would allow the State to admit any other relevant
24       portion. This argument lacks merit, as NRS 47.120 provides
         that when a writing or recorded statement is admitted, any part
25       of it that is relevant to the part introduced may be admitted as
         well.

26           District court evidentiary rulings are reviewed for an abuse of
27       discretion. *Hernandez v. State*, 124 Nev. 639, 646, 188 P.3d 1126, 1131
         (2008). NRS 51.325 provides that prior testimony is not excluded by the
28       hearsay rule if (1) the declarant is unavailable as a witness, (2) the party

1

> against whom the former testimony is offered was a party or is in privity with
> one of the former parties, and (3) the issues are substantially the same.

2

3

> Here, it is undisputed that Taoipu was unavailable in Hidalgo's trial
> and that the State was a party in both trials. Thus, the relevant inquiry
> becomes whether the issues were substantially the same. We conclude that
> they were not. Counts was the direct perpetrator of the murder and there
> was abundant evidence of his conspiracy with Carroll and Taoipu.
> Accordingly, the State had no motive in the Counts trial to impeach Taoipu's
> statement for the superfluous goal of identifying further members of the
> conspiracy. Further, in the Counts trial, the origin of the statement Hidalgo
> sought to admit was largely irrelevant for proving Counts' culpability. In the
> instant case, the origin of the statement is at issue. Because the issues are
> not substantially the same, the district court properly excluded Taoipu's
> former testimony.

4

5

6

7

8

9

(ECF No. 26-8 at 7–8.)

10

### 3. Analysis

11

To be sure, introducing Taoipu's prior testimony at Counts's trial, which would

12

have contradicted Zone's testimony that Petitioner Hidalgo was the one who spoke of

13

baseball bats and trash bags to Carroll, would have allegedly been helpful defense

14

evidence. However, even if Taoipu's prior statement was exculpatory, the Court cannot

15

conclude that Petitioner Hidalgo's constitutional rights were violated by the state district

16

court's denial of his ability to admit the statement. The Nevada Supreme Court, the final

17

arbiter of Nevada law, determined that the state district court's evidentiary ruling was

18

not an abuse of discretion according to Nevada law. Indeed, the Nevada Supreme Court

19

reasonably determined, under NRS § 51.325,[7] that the issue surrounding Taoipu's prior

20

testimony was not substantially the same as it would be at Petitioner Hidalgo's trial

21

because Taoipu's statement at Counts's trial was superfluous, which was not the case

22

in the current action.

23

Consequently, because the state courts determined that the evidence did not

24

meet the standards required by NRS § 51.325, thereby constituting a valid state

25

justification for its exclusion, *see Crane*, 476 U.S. at 690-91, it cannot be concluded that

26

_____

27

[7]NRS § 51.325 provides that "[t]estimony given as a witness at another hearing . .
. is not inadmissible under the hearsay rule if: (1) [t]he declarant is unavailable as a
witness; and (2) . . . the party against whom the former testimony is offered was a party .
. . and the issues are substantially the same."

28

1   Petitioner Hidalgo's right to present a complete defense, right to due process, and right
2   to a fair trial were violated. *See Chambers*, 410 U.S. at 294; *Trombetta*, 467 U.S. at 485.
3   As such, because the Nevada Supreme Court's determination constitutes an objectively
4   reasonable application of clearly established federal law and was not based on an
5   unreasonable application of the facts, Petitioner Hidalgo is not entitled to federal habeas
6   relief for ground 3.

7         **D.**    **Ground 4—Deadly Weapon Enhancement Jury Instruction**

8        In ground 4, Petitioner Hidalgo alleges that his Fifth, Sixth, and Fourteenth
9   Amendment rights to a fair trial, to due process of law, and to effective assistance of
10  counsel at trial and on direct appeal were impinged when counsel did not tender a jury
11  instruction directing the jury not to find the deadly weapon enhancement if the jury were
12  to find him guilty of second-degree murder on a conspiracy theory, absent evidence of
13  use of a weapon as part of the conspiracy. (ECF No. 67 at 86.) Alternatively, Petitioner
14  Hidalgo alleges that his trial counsel was prejudicially ineffective in not making this attack
15  part of his motion for judgment of acquittal. (*Id.*)

16          **1.**    **Standard for ineffective assistance of counsel**

17       In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for
18  analysis of claims of ineffective assistance of counsel requiring the petitioner to
19  demonstrate (1) that the attorney's "representation fell below an objective standard of
20  reasonableness," and (2) that the attorney's deficient performance prejudiced the
21  defendant such that "there is a reasonable probability that, but for counsel's
22  unprofessional errors, the result of the proceeding would have been different." 466 U.S.
23  668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel
24  must apply a "strong presumption that counsel's conduct falls within the wide range of
25  reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that
26  counsel made errors so serious that counsel was not functioning as the 'counsel'
27  guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish
28  prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the

1    errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693.

2    Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial

3    whose result is reliable." *Id.* at 687.

4          This standard is also utilized to review appellate counsel's actions: a petitioner

5    must show "that [appellate] counsel unreasonably failed to discover nonfrivolous issues

6    and to file a merits brief raising them" and then "that, but for his [appellate] counsel's

7    unreasonable failure to file a merits brief, [petitioner] would have prevailed on his

8    appeal." *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

9          Where a state district court previously adjudicated the claim of ineffective

10   assistance of counsel under *Strickland*, establishing that the decision was unreasonable

11   is especially difficult. *See Richter*, 562 U.S. at 104–05. In *Richter*, the United States

12   Supreme Court clarified that *Strickland* and § 2254(d) are each highly deferential, and

13   when the two apply in tandem, review is doubly so. *Id.* at 105; *see also Cheney v.*

14   *Washington*, 614 F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a state

15   court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential

16   standards apply; hence, the Supreme Court's description of the standard as doubly

17   deferential.") (internal quotation marks omitted). The Supreme Court further clarified

18   that, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were

19   reasonable. The question is whether there is any reasonable argument that counsel

20   satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

21                    **2.    State court determination**

22         In affirming the denial of Petitioner Hidalgo's state habeas petition, the Nevada

23   Supreme Court held:

24         Second, appellant contends that the district court erred by denying
           his claim that trial counsel were ineffective for failing to challenge the
25         deadly-weapon enhancement based on *Moore v. State*, 117 Nev. 659, 663,
           27 P.3d 447, 450 (2001) (holding that "it is improper to enhance a sentence
26         for conspiracy using the deadly weapon enhancement."). Because the
           deadly weapon enhancement was not applied to the conspiracy conviction,
27         appellant failed to demonstrate that counsel was ineffective. To the extent
           appellant challenges the instruction given at trial based on *Brooks v. State*,
28         124 Nev. 203, 180 P.3d 657 (2008), no relief is warranted because the

                                              19

1
2

instruction complied with *Brooks*; moreover, appellant has challenged the instruction for the first time on appeal. Therefore, we conclude that the district court did not err by denying this claim.

3

(ECF No. 26-16 at 3–4.)

4

### 3.    Analysis

5

In *Moore v. State*, the Nevada Supreme Court "conclude[d] that it is improper to

6

enhance a sentence for conspiracy using the deadly weapon enhancement." 27 P.3d

7

447, 450 (Nev. 2001). The Nevada Supreme Court reasoned that "[b]ecause an unlawful

8

agreement is the essence of the crime of conspiracy and because in Nevada conspiracy

9

is committed upon reaching the unlawful agreement," a defendant can "not 'use' a

10

deadly weapon to commit the crime of conspiracy for purposes of the deadly weapon

11

enhancement." *Id.* As the Nevada Supreme Court reasonably concluded here, the

12

deadly weapon was not used to enhance Petitioner Hidalgo's conspiracy conviction.

13

Rather, it was only used to enhance his second-degree murder conviction. (ECF No.

14

26-17 at 35 (providing in Jury Instruction No. 31 that "if you find a defendant guilty of

15

Murder of the First Degree, or Murder of the Second Degree, you must also determine

16

whether or not a deadly weapon was used in the commission of this crime").)

17

The Court now turns to Petitioner Hidalgo's argument that a deadly weapon

18

cannot be used to enhance a murder conviction if that murder conviction is premised on

19

a conspiracy theory of liability. In *Brooks v. State*, the Nevada Supreme Court concluded

20

that a defendant "is subject to a sentence enhancement" if "the unarmed offender is

21

liable as a principal for the offense that is sought to be enhanced, another principal to

22

the offense is armed with and uses a deadly weapon in the commission of the offense,

23

and the unarmed offender had knowledge of the use of the deadly weapon." 180 P.3d

24

657, 661 (Nev. 2008). As the Nevada Supreme Court reasonably concluded here, Jury

25

Instruction No. 33 complied with *Brooks*. (ECF No. 26-17 at 37 (providing in Jury

26

Instruction No. 33 that "[a]n unarmed offender 'uses' a deadly weapon when the

27

unarmed offender is liable for the offense, another person liable to the offense is armed

28

20

with and uses a deadly weapon in the commission of the offense, and the unarmed offender had knowledge of the use of the deadly weapon").)

Because the jury instructions given on the deadly weapon enhancement were accurate recitations of Nevada law as reasonably determined by the Nevada Supreme Court, the final arbiter of Nevada law, Petitioner Hidalgo fails to demonstrate that his trial or appellate counsel were ineffective regarding the deadly weapon enhancement jury instructions. Accordingly, the Nevada Supreme Court's determination constitutes an objectively reasonable application of federal law under *Strickland* and was not based on an unreasonable determination of the facts. Petitioner Hidalgo is not entitled to federal habeas relief for ground 4.

### E.    Ground 5—Out-of-Court Statement Instruction

In ground 5, Petitioner Hidalgo alleges that his Fifth, Sixth, and Fourteenth Amendment rights to a fair trial, to due process of law, and to effective assistance of counsel at trial and on direct appeal were impinged when counsel failed and refused to tender a jury instruction that out-of-court statements made by co-conspirators may not be considered against him if the statements themselves were the only evidence of his participation in the conspiracy. (ECF No. 67 at 89.)

#### 1.    State court determination

In affirming the denial of Petitioner Hidalgo's state habeas petition, the Nevada Supreme Court held:

> Third, appellant contends that the district court erred by denying his claim that trial counsel were ineffective for failing to proffer an instruction regarding the admissibility of co-conspirator statements that was consistent with the Federal Rules of Evidence, and appellate counsel was ineffective for failing to argue that the admission of his co-conspirator's statements violated *Crawford v. Washington*, 541 U.S. 36, 56 (2004). Appellant failed to demonstrate that the instructions given at trial were incorrect or that the statements should not have been admitted. *See McDowell v. State*, 103 Nev. 527, 529, 746 P.2d 149, 150 (1987) (adopting the "slight evidence" standard in Nevada); *see also Crawford*, 541 U.S. at 56 (recognizing that statements made in furtherance of a conspiracy are nontestimonial); *Lilly v. Virginia*, 527 U.S. 116, 137 (1999) (recognizing that statements made in the furtherance of a conspiracy are reliable). Therefore, he fails to demonstrate that counsel were ineffective. Accordingly, we conclude that the district court did not err by denying this claim.

(ECF No. 26-16 at 4.)

## 2. Analysis

Jury Instruction No. 40 was the jury instruction on out-of-court statements made by co-conspirators: "Whenever there is slight evidence that a conspiracy existed, . . . then the statements and the acts by any person likewise a member may be considered by the jury as evidence in the case as to the defendant found to have been a member, even though the statements and acts may have occurred in the absence and without the knowledge of the defendant" if the "statements and acts were knowingly made and done during the continuance of such conspiracy, and in furtherance of some object or purpose of the conspiracy." (ECF No. 26-17 at 44.) As the Nevada Supreme Court reasonably determined, Jury Instruction No. 40 complied with Nevada law.

NRS § 51.035(3)(e) provides that a "statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay. And Nevada caselaw only requires the state district court to find that a conspiracy existed by "slight evidence." *See McDowell v. State*, 746 P.2d 149, 150 (Nev. 1987). Because Jury Instruction No. 40's slight evidence language was an accurate recitation of Nevada law as reasonably determined by the Nevada Supreme Court, the final arbiter of Nevada law, Petitioner Hidalgo fails to support his argument that under Nevada law out-of-court statements made by co-conspirators may only be considered if there was other evidence of his participation in the conspiracy. As such, Petitioner Hidalgo fails to demonstrate that his trial or appellate counsel were ineffective for not making that argument, and the Nevada Supreme Court's determination constitutes an objectively reasonable application of federal law under *Strickland* and was not based on an unreasonable determination of the facts. Petitioner Hidalgo is not entitled to federal habeas relief for ground 5.

## F. Ground 6—Jury Instruction Nos. 19, 20, and 22

In ground 6, Petitioner Hidalgo alleges that his Fifth, Sixth, and Fourteenth Amendment rights to a fair trial, to due process of law, and to effective assistance of

counsel at trial and on direct appeal were impinged when trial counsel failed to object to Jury Instruction Nos. 19, 20, and 22 and failed to tender instructions that more precisely defined the concepts of "vicarious liability for a second degree murder." (ECF No. 67 at 94.) Specifically, Petitioner Hidalgo argues that none of the instructions advised the jury that it had to find that Petitioner Hidalgo had to act with implied malice or that the underlying felony was the proximate cause of the death in question. (*Id.* at 95–96.)

### 1.    Background information

Petitioner Hidalgo was charged with murder with the use of a deadly weapon under two theories of criminal liability: (1) "by aiding and abetting the commission of the crime by, directly or indirectly, . . . procuring . . . Carroll to beat and/or kill" Hadland, and/or (2) "by conspiring to commit the crime of battery and/or battery with use of a deadly weapon and/or battery resulting in substantial bodily harm and/or to kill" Hadland "whereby each and every co-conspirator is responsible for . . . the natural and foreseeable general intent crimes of each and every co-conspirator during the course and in furtherance of the conspiracy." (ECF No. 20-9 at 3–4.) The jury found Petitioner Hidalgo guilty of second-degree murder with the use of a deadly weapon. (ECF No. 26-1 at 3.) The jury's reliance on a particular theory of liability is unclear. Jury Instruction Nos. 19, 20, and 22 instructed, in part, the jury on these theories of liability.

Jury Instruction No. 19 provided:

> Murder in the First Degree is a specific intent crime. A Defendant can not be liable under conspiracy and/or aiding and abetting theory for First Degree Murder for acts committed by a co-conspirator, unless, Defendant also had a premeditated and deliberate specific intent to kill.

> Murder in the Second Degree may be a general intent crime. As such, Defendant may be liable under conspiracy theory or aiding and abetting theory for Murder of the Second Degree for acts committed by a co-conspirator if the killing is one of the reasonably foreseeable probable and natural consequences of the object of the conspiracy or the aiding and abetting.

(ECF No. 26-17 at 23.)

Jury Instruction No. 20 provides:

> Where two or more persons are accused of committing a crime together, their guilt may be established without proof that each personally did every act constituting the offense charged.
>
> All persons concerned in the commission of a crime who either directly and actively commit the act constituting the offense or who knowingly and with criminal intent aid and abet in its commission or, whether present or not, who advise and encourage its commission, with the intent that the crime be committed, are regarded by the law as principals in the crime thus committed and are equally guilty thereof.
>
> A person aids and abets the commission of a crime if he knowingly and with criminal intent aids, promotes, encourages or instigates by act or advice, or by act and advise, the commission of such crime with the intention that the crime be committed.
>
> The State is not required to prove precisely which defendant actually committed the crime and which defendant aided and abetted.

(*Id.* at 24.)

Jury Instruction No. 22 provides:

> Where several parties join together in a common design to commit any lawful act, each is criminally responsible for the reasonably foreseeable general intent crimes committed in furtherance of the common design. In contemplation of law, as it relates to general intent crimes, the act of one is the act of all. Battery, Battery Resulting in Substantial Bodily Harm and Battery With A Deadly Weapon are general intent crimes. Second Degree Murder can be a general intent crime.
>
> Additionally, a co-conspirator is guilty of the offenses he specifically intended to be committed. First Degree Murder is a specific intent crime.

(*Id.* at 26.)

## 2.    State court determination

In affirming the denial of Petitioner Hidalgo's state habeas petition, the Nevada Supreme Court held:

> First, appellant contends that the district court erred by denying his claim that trial counsel were ineffective for failing to tender appropriate instructions regarding second-degree murder. Specifically, appellant challenges the instructions relating to co-conspirator liability and second-degree felony murder. Regarding the co-conspirator liability instructions, appellant failed to demonstrate that the instructions given at trial were inaccurate. *See Bolden v. State*, 121 Nev. 908, 923, 124 P.3d 191, 201 (2005) (holding that "vicarious coconspirator liability may be properly imposed for general intent crimes only when the crime in question was a 'reasonably foreseeable consequence' of the object of the conspiracy"). To the extent appellant argues that second-degree murder is not a general

intent crime pursuant to *Ho v. Carey*, 332 F.3d 587, 592 (9th Cir. 2003), his reliance on *Ho* is misplaced because *Ho* addressed California law. Regarding second-degree felony murder, even assuming that the jury was not properly instructed pursuant to *Labastida v. State*, 115 Nev. 298, 307, 986 P.2d 443, 449 (1999), appellant failed to demonstrate that trial counsel were deficient or that he was prejudiced given the evidence presented at trial and the theories of vicarious liability alleged in the charging document. Therefore, we conclude that the district court did not err by denying this claim.

> [FN1] For the same reasons, we conclude the district court did not err by denying appellant's claim regarding appellate counsel.

(ECF No. 26-16 at 2–3.)

### 3.    Analysis

The Nevada Supreme Court, the final arbiter of Nevada law, reasonably determined that the jury was properly instructed about second-degree murder under Nevada law. First, with respect to vicarious co-conspirator liability, the Nevada Supreme Court has held that "vicarious coconspirator liability may be properly imposed for general intent crimes only when the crime in question was a 'reasonably foreseeable consequence' of the object of the conspiracy." *Bolden v. State*, 124 P.3d 191, 201 (Nev. 2005), *receded from on other grounds by Cortinas v. State*, 195 P.3d 315, 324 (Nev. 2008). As the Nevada Supreme Court reasonably noted here, Jury Instruction No. 19 tracks this language. (ECF No. 26-17 at 23 ("Defendant may be liable under conspiracy theory or aiding and abetting theory for Murder of the Second Degree for acts committed by a co-conspirator if the killing is one of the reasonably foreseeable probable and natural consequences of the object of the conspiracy or the aiding and abetting.").) Second, as to Petitioner Hidalgo's argument that none of the instructions advised the jury that it had to find he acted with malice, the record belies Petitioner Hidalgo's argument. Jury Instruction No. 6, which mirrors NRS § 200.010(1),[8] provided that "[m]urder is the unlawful killing of a human being, with malice aforethought, either express or implied." (ECF No. 26-17 at 10.) And Jury Instruction No. 13 provided, in

---

[8]NRS § 200.010(1) provides that "[m]urder is the unlawful killing of a human being . . . [w]ith malice aforethought, either express or implied."

relevant part, that "[m]urder of the Second Degree is . . . [m]urder with malice aforethought, but without the admixture of premeditation and deliberation." (*Id.* at 17.) Third, as to Petitioner Hidalgo's argument that none of the instructions advised the jury that the underlying felony must be the proximate cause of the death in question, the Nevada Supreme Court reasonably noted that felony murder was not alleged as a theory of liability.

Accordingly, the Nevada Supreme Court's determination that Petitioner Hidalgo failed to demonstrate that his trial and appellate counsel were ineffective regarding the second-degree murder jury instructions constitutes an objectively reasonable application of federal law under *Strickland* and was not based on an unreasonable determination of the facts. Petitioner Hidalgo is not entitled to federal habeas relief for ground 6.

### G.    Ground 7—Severance

In ground 7, Petitioner Hidalgo alleges that his Fifth, Sixth, and Fourteenth Amendment rights to a fair trial, due process of law, and effective assistance of counsel at trial and on direct appeal were impinged when counsel did not seek a partial severance under *Morales v. State* in the middle of trial to gain the admission of Taoipu's former testimony, which the Court discussed in ground 3. (ECF No. 67 at 101.)

In *Morales v. State*, the Nevada Supreme Court concluded that the state district courts may bifurcate, rather than completely sever, "where the State, in the indictment or criminal information, joins a charge of unlawful possession of a firearm by an ex-felon with other substantive criminal violations." 143 P.3d 463, 464 (Nev. 2006). Citing *Morales*, Petitioner Hidalgo argues that his trial counsel should have argued for the following remedy: "allow [Hidalgo Sr.] to finish his case, have the jury deliberate and reach a verdict as to him," and "[t]hen, without discharging the jury," let him "present the sworn testimony of Mr. Taoipu, and then present the cause [sic] to the same jury for return of the second verdict regarding" him. (ECF No. 67 at 103–04.)

///

### 1.   Background information

Petitioner Hidalgo's trial counsel testified at the post-conviction evidentiary hearing that he "[v]ery much" wanted Taoipu to testify because Taoipu had made a statement in Counts's trial that "exonerated or was exculpatory for" Petitioner Hidalgo. (ECF No. 26-12 at 17–18.) Counsel attempted to locate Taoipu, but "he had in essence skipped town." (*Id.* at 19.) Counsel sought to admit Taoipu's prior testimony, but the prosecution stated that if an excerpt of Taoipu's former testimony would be admitted, then all his former testimony would need to be admitted. (*Id.* at 19–20.) Hidalgo Sr.'s counsel objected on Confrontation Clause grounds. (*Id.* at 20.)

Petitioner Hidalgo's counsel argued that excluding the testimony violated Petitioner Hidalgo's due process rights, but he "did not move for a severance at that time." (*Id.* at 21.) Counsel testified that he "failed to request the severance which in hindsight and going through the appeal and to this day [he] regret[s]." (*Id.* at 23.) Counsel explained the basis of his regret: "[w]e would have moved for the severance and preserved that issue for appeal regardless of how [the court] ruled" on the admissibility of Taoipu's testimony. (*Id.* at 35.)

Importantly, counsel testified that before trial Petitioner Hidalgo and Hidalgo Sr. stipulated with the prosecution "to waive the death penalty in exchange for trying the case[s] together." (*Id.*) At the post-conviction evidentiary hearing, the state district court stated, "the Court ruled that the . . . prior testimony of Mr. Taoipu wouldn't come in regardless for either defendant," so it did not "see any point at that juncture to have moved for severance." (*Id.* at 49.) The state district court also explained: "[c]learly that motion [to sever] would have been denied. And it would have exposed both defendants . . . to the possibility of having the State seek the death penalty, which is a huge, huge risk." (*Id.*) Therefore, the state district court "f[ou]nd it curious . . . that for some sort of attenuated appellate position [counsel] would have subjected his client to such a risk" and found it incredible that counsel "would have moved for severance [during trial] based on the record and the Court's comments." (*Id.*)

## 2.      State court determination

In affirming the denial of Petitioner Hidalgo's state habeas petition, the Nevada Supreme Court held:

> Fourth, appellant contends that the district court erred by denying his claim that trial counsel were ineffective for failing to seek a severance during trial to admit evidence that was favorable to him but unfavorable to his codefendant. We disagree because the trial court did not decline to admit the evidence based on prejudice to appellant's codefendant and therefore a severance would not have been granted on this basis. Because appellant failed to demonstrate that a severance would have been granted under the circumstances, trial counsel were not ineffective. Therefore, we conclude that the district court did not err by denying this claim.

(ECF No. 26-16 at 4-5.)

## 3.      Analysis

The Nevada Supreme Court reasonably concluded that Petitioner Hidalgo failed to demonstrate that his trial counsel was deficient for not moving to sever his trial from Hidalgo Sr.'s trial to admit Taoipu's testimony and his appellate counsel was deficient for failing to include this issue in his direct appeal. *See Strickland*, 466 U.S. at 688. Before trial, Petitioner Hidalgo agreed to the joinder of his trial with Hidalgo Sr.'s trial in exchange for the prosecution waiving the death penalty. Consequently, the state district court reasonably noted that it would have been risky to ask for a severance during trial because a new trial could have exposed Petitioner Hidalgo to the death penalty. Further, regarding a bifurcation during the trial, the state district court stated at the post-conviction evidentiary hearing that she presided over the trial and (1) would not have allowed Taoipu's testimony to be admitted regardless of bifurcation, and (2) would have denied any type of motion to sever or bifurcate. Thus, because seeking bifurcation would have been futile, the Nevada Supreme Court's determination that Petitioner Hidalgo failed to demonstrate that his trial counsel and appellate counsel were ineffective constitutes an objectively reasonable application of federal law under *Strickland* and was not based on an unreasonable determination of the facts. Petitioner Hidalgo is not entitled to federal habeas relief for ground 7.

///

28

**H.    Ground 8—Motion to Sever the Charges**

In ground 8, Petitioner Hidalgo alleges that his Fifth, Sixth, and Fourteenth Amendment rights to a fair trial, due process of law, and effective assistance of counsel at trial and on direct appeal were violated when trial counsel failed to move to sever the solicitation of murder counts, which regarded Petitioner Hidalgo's solicitation of Carroll to kill Taoipu and Zone with rat poison, from the murder and conspiracy to murder counts regarding Hadland. (ECF No. 67 at 106.)

**1.    Background information**

At a post-conviction hearing, the state district court judge, who also presided over Petitioner Hidalgo's trial, noted, "had [Petitioner Hidalgo's trial counsel] filed that motion [to sever counts 1 and 2 from counts 3 and 4] that would have been clearly denied" because "all of the evidence would have essentially been the same even if you had tried to sever it." (ECF No. 26-11 at 11.) The state district court judge explained that the prosecution was not using the solicitation counts, the stronger of the counts, to say Petitioner Hidalgo was "a bad guy" so "he must have been involved in these other things." (*Id.* at 12.) Rather, the prosecution used the solicitation counts "to show [Petitioner Hidalgo's] involvement in this whole thing and his knowledge and his desire to sort of clean it all up and tie it all together." (*Id.* at 12.) As such, regarding any prejudice Petitioner Hidalgo may have suffered from his counsel's failure to move to sever the counts, the state district court judge stated, "we don't need to, you know, surmise what would have happened. I can tell you what would have happened because I was the trial judge." (*Id.* at 13.) Later, at the continued post-conviction evidentiary hearing, Petitioner Hidalgo's post-conviction counsel reiterated the state district court's previous comments on this issue: "you stated in court about how you would not have granted a motion to sever counts." (ECF No. 26-12 at 6.) The state district court commented: "I can say I wouldn't have granted it . . .  On this one I wasn't on the line. Revisiting the issue, I decided again, no, I wouldn't have severed those." (*Id.* at 10.)

///

## 2.     Nevada law on severance

In relevant part, NRS § 173.115 provides that "[t]wo or more offenses may be charged in the same indictment or information . . . if the offenses charged . . . are . . . [b]ased on two or more acts or transactions connected together or constituting parts of a common scheme or plan." And NRS § 174.165(1) provides that "[i]f it appears that a defendant or the State of Nevada is prejudiced by a joinder of offenses . . . in an indictment or information, or by such joinder for trial together, the court may order an election or separate trials of counts." This determination is discretionary. *See Jones v. State*, 899 P.2d 544, 547 (Nev. 1995).

## 3.     State court determination

In affirming the denial of Petitioner Hidalgo's state habeas petition, the Nevada Supreme Court held:

> Fifth, appellant contends that the district court erred by denying his claim that trial counsel were ineffective for failing to seek a severance of the solicitation counts. Appellant failed to demonstrate that a severance would have been granted because the counts were clearly connected together. *See Weber v. State*, 121 Nev. 554, 573, 119 P.3d 107, 120 (2005). Therefore counsel were not ineffective. Accordingly, we conclude that the district court did not err by denying this claim.

(ECF No. 26-16 at 5.)

## 4.     Analysis

The Nevada Supreme Court reasonably concluded that Petitioner Hidalgo failed to demonstrate prejudice. *See Strickland*, 466 U.S. at 694. On post-conviction review, the state district court judge, who also presided over Petitioner Hidalgo's trial, stated that she would not have granted a motion to sever the counts. Petitioner Hidalgo fails to demonstrate that the result of the proceedings would have been different if his trial counsel had filed such a motion or that he would have prevailed on appeal had his appellate counsel included this claim on appeal. This is because (1) granting a motion to sever is discretionary under NRS § 174.165(1), and (2) the same state district court judge definitively stated that she would not have used her discretion to grant such a motion. And the Nevada Supreme Court, the final arbiter of Nevada law, reasonably

1  agreed because the solicitation of murder counts were connected with the murder and

2  conspiracy counts under NRS § 173.115. Indeed, the solicitation of murder counts

3  demonstrated Petitioner Hidalgo's knowledge of Hadland's murder and desire to

4  eliminate witnesses to it. Accordingly, the Nevada Supreme Court's determination

5  constitutes an objectively reasonable application of federal law under *Strickland* and

6  was not based on an unreasonable determination of the facts. Petitioner Hidalgo is not

7  entitled to federal habeas relief for ground 8.

8      **I.    Ground 16—Cumulative Error**[9]

9      In ground 16, Petitioner Hidalgo alleges that his trial and appellate counsel's

10  cumulative errors violated his right to equal protection, a fair trial, due process of law,

11  and effective assistance of counsel under the Fifth, Sixth, and Fourteenth Amendments.

12  (ECF No. 67 at 154.) In affirming the denial of Petitioner Hidalgo's state habeas petition,

13  the Nevada Supreme Court held: "appellant contends that cumulative error entitles him

14  to relief. Because we have found no error, there are no errors to cumulate." (ECF No.

15  26-16 at 5.)

16      Cumulative error applies where, "although no single trial error examined in

17  isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple

18  errors may still prejudice a defendant." *United States v. Frederick*, 78 F.3d 1370, 1381

19  (9th Cir. 1996); *see also Parle v. Runnels*, 387 F.3d 1030, 1045 (9th Cir. 2004)

20  (explaining that the court must assess whether the aggregated errors "'so infected the

21  trial with unfairness as to make the resulting conviction a denial of due process'" (citing

22  *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The Court has not identified any

23  errors on the part of Petitioner Hidalgo's trial or appellate counsel, so there are no errors

24  to cumulate. Petitioner Hidalgo is not entitled to federal habeas relief for ground 16.[10]

25      [9]The Court previously partially dismissed ground 16 as it related to errors on his
26  direct appeal. (ECF Nos. 83 at 18, 84, 86.)

27      [10]Petitioner Hidalgo requests that the Court conduct an evidentiary hearing. (ECF
28  No. 67 at 155.) Petitioner Hidalgo fails to explain what evidence would be presented at an evidentiary hearing. Furthermore, the Court has already determined that Petitioner

V.    **CERTIFICATE OF APPEALABILITY**

This is a final order adverse to Petitioner Hidalgo. Rule 11 of the Rules Governing Section 2254 Cases requires the Court to issue or deny a certificate of appealability (COA). The Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002). Under 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the Court's procedural ruling was correct. *Id*.

Applying these standards, the Court finds that a certificate of appealability is unwarranted.

VI.   **CONCLUSION**

It is therefore ordered that Petitioner Hidalgo's third amended petition for a writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 67) is denied.

///
///
///
///
///
///

---

Hidalgo is not entitled to relief, and neither further factual development nor any evidence that may be proffered at an evidentiary hearing would affect this Court's reasons for denying relief. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."); *see also* 28 U.S.C. § 2254(e)(2). Thus, Petitioner Hidalgo's request for an evidentiary hearing is denied.

It is further ordered that a certificate of appealability is denied.

The Clerk of Court is directed to substitute Tim Garrett for Respondent Robert LeGrand, enter judgment accordingly, and close this case.

DATED THIS 23rd Day of September 2022.

_____
MIRANDA M. DU,
UNITED STATES DISTRICT JUDGE